1   SCOTT N. SCHOOLS(SCBN 9990)
    United States Attorney
2
    MARK L. KROTOSKI (CABN 138549)
3   Chief, Criminal Division

4   KIRSTIN M. AULT (CABN 206052)
    Assistant U.S. Attorney
5
        450 Golden Gate Ave., Box 36055
6       San Francisco, CA 94102
        Telephone: (415) 436-6940
7       Facsimile: (415) 436-7234
        E-mail: kirstin.ault@usdoj.gov
8
    Attorneys for the United States
9

**FILED**

MAY 11 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

*EDL*

3-07 70276

13

14  UNITED STATES OF AMERICA,          )    CRIMINAL NO.
                                       )
15          Plaintiff,                 )
                                       )
16          v.                         )    NOTICE OF PROCEEDINGS ON
                                       )    OUT-OF-DISTRICT CRIMINAL
17  WILLIAM SHANNON,                   )    CHARGES PURSUANT TO RULES
                                       )    5(c)(2) AND (3) OF THE FEDERAL RULES
18                                     )    OF CRIMINAL PROCEDURE
                                       )
19          Defendant.                 )
                                       )
20  _____   )

21          Please take notice pursuant to Rules 5(c)(2) and (3) of the Federal Rules of Criminal

22  Procedure that on or about May 11, 2007, the above-named defendant was arrested based upon

23  an arrest warrant (copy attached) issued in case number 07-228 M  in the Western District of

24  Pennsylvania, upon an

25      ☐   Indictment

26      ☐   Information

27      X   Criminal Complaint

28      ☐   Other (describe)

In that case, the defendant is charged with violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii), and 846, possession with intent to distribute a controlled substance, and conspiracy to distribute a controlled substance, namely 5 kilograms or more of cocaine.

Description of Charges: Defendant possessed with intent to distribute cocaine, and conspired to distribute cocaine to a purchaser in the Pittsburgh, Pennsylvania area, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii), and 846.

Maximum Penalties: mandatory minimum prison term of 10 years; maximum prison term of life; $4,000,000 fine; mandatory minimum supervised release term of 5 years; maximum supervised release term of life; $100 special assessment.

Respectfully Submitted,

SCOTT N. SCHOOLS
UNITED STATES ATTORNEY

Date: _May 11, 2007_

KIRSTIN M. AULT
Assistant U.S. Attorney

# *United States District Court*

_____ *WESTERN* _____ *DISTRICT OF* _____ *PENNSYLVANIA* _____

UNITED STATES OF AMERICA

V.

WILLIAM SHANNON a/k/a "OG"

**WARRANT FOR ARREST**

CASE NUMBER:  $07 \cdot 228 M$

~~UNDER SEAL~~

To:    The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest ___ William Shannon a/k/a OG ___
Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☐ Indictment ☐ Information ☒ Complaint ☐ Order of Court ☐ Violation Notice ☐ Probation Violation Petition

charging him or her with (brief description of offense)

knowingly, intentionally and unlawfully conspire with persons known and unknown to distribute and possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii),

in violation of Title _21_____ United States Code, Section(s) __841(a)(1), 841(b)(1)(A)(ii), and 846___

Amy Reynolds Hay _____
Name of Issuing Officer

_____
of Issuing Officer

U.S. Magistrate Judge_____
Title of Issuing Officer

May 8, 2007  at Pittsburgh, PA _____    Signature
Date and Location

Bail fixed at $ _____    by    _____
Name of Judicial Officer

| RETURN |
|---|

This warrant was received and executed with the arrest of the above-named defendant at _____

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
v.                              )   Magistrate's No. 07-228M
)   [UNDER SEAL]
WILLIAM SHANNON a/k/a OG        )

ORDER

AND NOW, to wit, this _14th_ day of May, 2007, it appearing to the Court that an Arrest Warrant for the above-captioned individual has been executed, it is hereby ORDERED that the United States may provide a copy of the arrest warrant, and complaint to the defendant. The matter shall remain under seal in all other respects.

UNITED STATES MAGISTRATE JUDGE

# United States District Court

_____ **WESTERN** _____ **DISTRICT OF** _____ **PENNSYLVANIA** _____

UNITED STATES OF AMERICA

V.

WILLIAM SHANNON a/k/a OG
(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: $07- \partial\partial\mathcal{Y}\mathcal{M}$
[UNDER SEAL]

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. From on or about __August 2003 to present__ in __Westmoreland__ county, in the

__Western__ District of __Pennsylvania__, defendant(s) did, (Track Statutory Language of Offense)

knowingly, intentionally and unlawfully conspire with persons known and unknown to distribute and possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii)

in violation of Title __21__ United States Code, Section(s) __846__.

I further state that I am a(n) __Special Agent of the Federal Bureau of Investigation__ and that this complaint is based on the following facts:                                                    Official Title

Continued on the attached sheet and made a part hereof:    ☒ Yes

_Sandra Maies_
Signature of Complainant

Sworn to before me and subscribed in my presence.

__May 8, 2007__
Date

at __Pittsburgh, Pennsylvania__
City and State

_signature_
Signature of Judicial Officer

__Amy Reynolds Hay, U.S. Magistrate Judge__
Name and Title of Judicial Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Miscellaneous No. $07-\lambda\lambda\beta m$
~~FINDER SEAL~~

## CONTINUATION OF CRIMINAL COMPLAINT

I, Sandra J. Maier, having been duly sworn, deposes and
states as follows:

1.    I, Sandra J. Maier, am a Special Agent of the Federal
Bureau of Investigation (FBI), United States Department of
Justice (USDOJ).  I have been employed as a Special Agent of the
FBI for  twelve years and have been assigned to the Pittsburgh
Division, Organized Crime/Gang Unit since December 2004.    Prior
to 2004, I  was assigned to the San Francisco, Washington and
Sacramento Field Offices.  During your affiant's assignments with
the FBI, your affiant has been assigned to investigations
targeting organizations involved in drug trafficking offenses in
the Western District of Pennsylvania.  While being trained as a
Special Agent of the FBI,  your affiant has received basic drug
training at the FBI Academy located in Quantico, Virginia.  Your
affiant has written and executed search and seizure warrants,
which have resulted in the seizure of illegal drugs and evidence
of violations of Title 21, United States Code, Sections
841(a)(1)(possession with intent to distribute and distribution
of narcotic controlled substances) and 846 (conspiracy to possess

1

with intent to distribute and distribute narcotic controlled substances). Your affiant has supervised informants who have provided information and assistance in the federal prosecution of drug offenders.

2.   For the reasons set forth below, I have probable cause to believe that from approximately March 2003 to present, in the Western District of Pennsylvania, and elsewhere, the defendants, William Shannon, Ray Kelly, Casee Kelly and Jacynta Jordan did knowingly, intentionally and unlawfully conspire with Marlin Kimbrew, not a defendant herein, and other persons known and unknown to distribute and possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectible amount of cocaine, a Schedule II Controlled Substance, as prohibited by  Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii), in violation of Title 21, United States Code, Section 846.

3.   On April 24, 2007, a grand jury sitting in the Western District of Pennsylvania returned a one Count Indictment charging Marlin Kimbrew with conspiring to distribute and possess with intent to distribute 5 kilograms or more of cocaine, in violation of Title 21, United States Code, Section 846.  Kimbrew is currently pending trial.

4.   Your affiant has received information from an individual, hereinafter referred to as CI1.  CI1 has been

2

convicted of violating Title 21, United States Code, Sections 841(a)(1) and 846 and has been sentenced to a term of imprisonment of twenty years. CI1 has agreed to cooperate with law enforcement agents in the hopes of obtaining a reduction in his/her sentence. The information received from CI1 has proven to be reliable in that it is corroborated by information received from other confidential sources and by other information obtained by your affiant during the course of this investigation. According to CI1, when he/she was released from jail in 2002, Marlin Kimbrew was playing professional overseas basketball in Indonesia with another individual, CI1 knows only as "Ray." "Ray," had connections for cocaine in San Francisco and Los Angeles. Kimbrew and CI1 flew to San Francisco where they met with individuals, subsequently identified as Jermaine Boddie and Saunders Mabrey. As a result of this meeting, CI1 purchased kilograms of cocaine from Boddie and Mabrey.

5. In August of 2003, CI1 and "Ray," attended the wedding of Marlin Kimbrew to his wife Latonda in Las Vegas, Nevada. While there, CI1, "Ray" and Kimbrew devised a plan pursuant to which kilograms of cocaine would be mailed from California to Pittsburgh. During 2004, CI1 and Kimbrew would get approximately 30 kilograms of cocaine a month from "Ray ." The kilograms of cocaine would be mailed to various residences in McKeesport, Pennsylvania. Kimbrew and CI1 would retrieve the

3

packages and take them to an apartment at 913 Center Street in
McKeesport, Pennsylvania, which Kimbrew had rented.  CI1 has
identified a photograph of Ray Kelly, as the individual he knows
as Ray.  Your affiant has obtained records from Federal Express,
which corroborate CI1's statements relating to packages being
shipped during the time period September 2003 to April 24, 2004
from various addresses in San Franciso to addresses provided by
CI1; including 634 Madison Street, McKeesport, Pennsylvania,
which is the known address of Marlin Kimbrew's mother, Linda
Kimbrew.  The majority of these packages were allegedly sent from
various individuals allegedly associated with Signal One
Promotions at fictitious addresses in San Francisco.  CI1 also
advised your affiant that she/he and Kimbrew sent the money for
the cocaine to addresses in San Franciso contained in large
cereal boxes he/she and/or Kimbrew obtained from Sams Club.

6.  Your affiant has also received information from a second
confidential informant, hereinafter CI2.  CI2 has been charged
with violations of Title 21, United States Code, Sections
841(a)(1) and 846 and is cooperating with law enforcement agents
in the hope of receiving a sentence reduction.  CI2's information
is believed to be reliable in that it is corroborated by
information received from other cooperating individuals and by
other information obtained by your affiant during the course of
this investigation.  According to CI2, from approximately March-

4

December 2004, he/she purchased 15-30 kilograms of cocaine from
Kimbrew each week.  Kimbrew would deliver the kilograms of
cocaine to CI2's residence in McKeesport, Pennsylvania.  CI2 also
indicated that an individual by the name of Carlisha Cunningham
told him/her that Kimbrew was having kilograms of cocaine mailed
to her address at 720 Shaw Street, McKeesport, Pennsylvania.  In
March and April, 2006, CI2 sold 3 kilograms of cocaine to Kimbrew
on two occasions.  According to CI2, in approximately the summer
of 2004, he/she was advised by Kimbrew's supplier had been
arrested based on cocaine that had been seized in Indianapolis,
Indiana.

7.  Your affiant also knows that in approximately October
2005, the individual identified by CI1 as "Ray" was sentenced in
the Southern District of Indiana to a term of 70 months
imprisonment for a violation of Title 21, United States Code,
Section 841(a)(1).  Your affiant further knows that the conduct
underlying the conviction involved the sending of two kilograms
of cocaine to an individual in Indianapolis, Indiana.  In
addition prior to Ray Kelly's arrest, agents executed a warrant
at his residence, at which time they seized approximately
$132,000.  Your affiant further knows that Ray Kelly was serving
his term of imprisonment at the camp portion of FCI La Tuna in El
Paso Texas.  Prior to commencing his term of imprisonment, Ray
Kelly was residing in San Francisco, California.

5

8. Your affiant knows that all telephone calls made from a Federal Correctional Institution are recorded. Your affiant, using administrative subpoenas, has obtained and reviewed numerous calls between Ray Kelly and his wife, Casee Kelly, Ray Kelly and Marlin Kimbrew; and Ray Kelly and an individual, who is referred to in the telephone calls as "OG" or Bill and has been identified as William Shannon, which occurred between January 2006 and March 2007. Your affiant also knows from information received from employees of FCI La Tuna, and from recorded calls made by Ray Kelly from FCI La Tuna that Ray Kelly was authorized to leave the prison on work release and that when he did so he was not under supervision. Your affiant further has reason to believe, based on recorded calls that Ray Kelly made from FCI La Tuna to a girlfriend, that Ray arranged for Marlin Kimbrew to supply him with a cellular telephone, which he could use while outside the prison on work release. Your affiant has identified the cellular telephone used by Ray while outside the prison, as a Verizon-Wireless/d/b/a Page Plus pre-paid cellular telephone, bearing telephone number (412) 779-8276. Your affiant has confirmed with an employee of Verizon Wireless that during the time period April to the end of June 2006, that based on cell tower cite information, this cellular telephone was located in El Paso, Texas. As will be discussed in further detail below, this cellular telephone was used by Ray Kelly to contact telephones

6

used by Marlin Kimbrew, as well as telephones known to be used by Ray's wife, Casee Kelly and William Shannon a/k/a "OG". Your affiant believes, for the reasons set forth below, that Kimbrew supplied Ray Kelly with this cellular telephone so that Ray Kelly could engage in drug related conversations with Kimbrew, Casee Kelly, William Shannon, and others without having those conversations recorded.

9. Based on your affiant's review of the telephone calls between Ray Kelly and the above delineated individuals, telephone toll records, as well as other evidence which will be discussed in further detail below, your affiant has reason to believe that sometime between the time period January 2006 and June 16, 2006, Ray Kelly, while incarcerated at FCI La Tuna, brokered a multi-kilogram cocaine deal between Kimbrew and William Shannon; using Casee Kelly, Jacynta Jordan and others to assist with the transaction.

10. On January 25, 2006, Ray Kelly and Casee Kelly discussed Casee Kelly contacting somebody to obtain what your affiant believes is money owed to Ray Kelly, as well as Marlin Kimbrew from a drug deal that went sour. In this call, Ray Kelly also tells Casee Kelly to tell "Stop-N-Drizzy" that maybe she should meet with "old boy" first. Your affiant knows from all the calls recorded at the prison that "Stop -N-Drizzy" is Casee Kelly.

7

11. Your affiant knows, based on having reviewed a copy of the tape recorded telephone call, that on January 28, 2006, Ray Kelly called Bill a/k/a OG. During this call, Ray referred to the other person on the line as "Bill." Bill told Ray: "If you want to give your boy, my number, cause we been losing." Ray said okay. Your affiant believes from subsequent telephone calls that "the boy" Bill a/k/a OG was referring to was Marlin Kimbrew, and that Bill was telling Ray to provide Kimbrew with his telephone number so that they could engage in narcotics transactions. Your affiant has also identified the individual referred to in the call as Bill a/k/a "OG" as William Shannon.

12. On February 3, 2006, Ray Kelly called Kimbrew. During this conversation, Ray Kelly told Kimbrew that "OG," referring to William Shannon, said "If you need me to take your girl [Kimbrew] somewhere, just let me know." Kimbrew asked: "You talking about me,?" to which Ray Kelly said "yeah." Your affiant believes that Ray Kelly is telling Kimbrew that Shannon told him that he was willing to engage in drug transactions with Kimbrew. Ray told Kimbrew to call his wife because she had his, "OG's," new telephone number. Kimbrew asked if it was a cell or house number. Ray Kelly told Kimbrew that it was a cell phone. Ray told Kimbrew he would talk to him later. Your affiant believes, based on prior and subsequent telephone calls, and other evidence obtained as a result of this investigation that Ray Kelly was

8

passing on Shannon's message to Kimbrew that Shannon was willing to engage in narcotics transactions with Kimbrew.

13. On February 28, 2006, Ray Kelly called his wife, Casee Kelly. During the course of this call, Casee Kelly told Ray Kelly that "Tonda's" coming out here [San Francisco] this weekend. She said something about your uncle." Ray Kelly asked: "OG?" Casee Kelly responded, that she didn't really know that, she said in the letter it was all good." Ray Kelly interrupted Casee Kelly and said "Okay, okay, I'll take care of it and I'll call you back tomorrow." Your affiant believes from prior and subsequent telephone calls and from other evidence obtained as a result of the investigation that Casee Kelly was telling Ray Kelly that Kimbrew and Shannon were to meet to discuss future drug transactions.

14. On March 1, 2006, Ray Kelly called Kimbrew and asked him if he was going "out there" [San Francisco] and if he talked to "OG," [Shannon]. Kimbrew said that he would be in Los Angeles on Friday and that he would go up there [San Francisco] on Saturday and come back to Los Angeles on Sunday. Ray Kelly asked Kimbrew if Kimbrew wanted his [Shannon's] number and Kimbrew replied that he would get everything from Casee Kelly when he got out there. Kimbrew asked about staying at a hotel in Oakland, but couldn't remember the name of the Resort and Spa. Kimbrew said that he would get the hotel from Casee Kelly. Kimbrew

9

talked about meeting "OG" [Shannon] and said: "I think I kinda remember what he looks like." Ray Kelly said he would remember him when he saw him. Kimbrew mentioned that he met him [Shannon] before at Ray Kelly's mother's house and Ray Kelly said that he also met him at a talent show. Ray Kelly said, "If everything works out and you start hollering at "J" right, , don't let. . . tell Stop-n-Drizzy, [referring to Casee Kelly] not to come to the games (drug deals.)" Based on prior and subsequent telephone calls, as well as other evidence gathered as a result of this investigation, your affiant believes that Kimbrew and Ray Kelly are discussing the arrangements Kimbrew has made to meet with Shannon for the purpose of negotiating future drug transactions.

15.   On March 1, 2006, Ray Kelly telephoned Shannon.  During the conversation, Ray told Shannon a/k/a OG that he "hollered at the boy, [Kimbrew] they thinking about trying to keep the team alive and stuff." [continuing to engage in drug transactions] Shannon a/k/a OG replied: "That's so cool cause you know where they make the basketballs at. He already, you know the board members already did it."   Shannon further indicated: "so it ain't, you know like we have to pay for shipping and handling, we can get them right there."   Your affiant believes that Shannon is telling Ray Kelly that his, Shannon's suppliers, have already obtained the cocaine and it was already ready and available.  Ray Kelly said, "The only thing is, he's , [referring to Kimbrew],

10

kinda concerned about what happened with the last stuff." Your

affiant believes that Ray Kelly is telling Shannon that Kimbrew

was concerned about the quality of the cocaine he was to receive

based on the quality of a prior shipment. Ray Kelly told Shannon

a/k/a OG that they [Kimbrew] were coming out there this weekend

and wanted to meet. Shannon said he was going to put them at

ease because they have been winning. Your affiant believes that

Shannon a/k/a OG was telling Ray Kelly that he could assure

Kimbrew about the quality of the cocaine that he could supply.

Ray said, "cause you still the head coach, I'm just filling in

for a minute." Your affiant believes that Shannon a/k/a OG was

referring to the fact that Ray had previously been the one who

negotiated the cocaine transactions with Kimbrew and that Shannon

a/k/a OG was just filling in for him while he was in prison. Ray

Kelly told Shannon a/k/a OG that he would have his wife, put

them [Kimbrew] in touch with Shannon a/k/a OG. Shannon a/k/a OG

asked if they would remember him and Ray Kelly said he, referring

to Kimbrew, asked him the same thing and said that they met at

the modeling show. Your affiant believes that during this

telephone call, Ray Kelly was telling Shannon a/k/a OG that

Kimbrew was interested in arranging drug deals, that Kimbrew

would be in California within the next few days and that Casee

Kelly would arrange for Kimbrew to meet up with Shannon a/k/a OG

to discuss future drug transactions.

11

16. On March 3, 2006, Ray Kelly called his wife. Ray Kelly asked Casee Kelly if she had talked to "Tonda." Casee Kelly said she had. Ray Kelly asked her if "she out that way?" She replied that she thought so, but hadn't talked to her that day. Ray Kelly told her to write a telephone number down, "720-5878" and said: "that's my Uncle Bill's number." At the end of the telephone conversation, Ray Kelly told Casee Kelly, "that number you got though." Casee Kelly asked him: "What am I supposed to do with it?" to which Ray Kelly responded: "Call that number first, you call it first to let him know. Once you get in touch with him tell him that the Board of Directors, [believed to be Kimbrew] is going to holler at him." Casee Kelly agreed to do so. Your affiant believes that the "Tonda" to whom Ray Kelly was referring was Marlin Kimbrew. Your affiant further believes that in this telephone call Ray Kelly was providing Casee Kelly with instructions to put Kimbrew in contact with Shannon a/k/a OG for the purpose of negotiating future drug transactions.

17. On March 3, 2006 Ray Kelly called Shannon a/k/a OG. Ray Kelly told Shannon a/k/a OG that: "Wifey going to hit you up. The board [Kimbrew], they, I talk to the board members [Kimbrew], they gonna holler at you, they out there. They gonna holler at you this weekend." Shannon a/k/a OG told Ray Kelly to call him on Monday so he can let him know how the board meeting went. Your affiant believes that the term "board members" is being used

12

to refer to Kimbrew and that Ray Kelly is telling Shannon a/k/a
OG, that Casee Kelly, is going to arrange for Kimbrew to meet up
with or talk to Shannon a/k/a OG that weekend so that they could
discuss future drug transactions.

18. On March 4, 2006, Ray Kelly called Casee Kelly.  Ray
Kelly asked Casee Kelly where she was at.  Casee Kelly stumbled
and then said "never mind."  Your affiant believes that at that
time Casee Kelly was in the process of setting up the meeting
between Kimbrew and Shannon a/k/a OG; the purpose of which was to
negotiate future drug transactions.  Ray asked his wife if she
had talked to "Tonda" and "B."  She replied: "yep."  Ray Kelly
asked her if she was "situated."  She responded: "I guess so."
Later on in the conversation, Casee Kelly told Ray Kelly that she
was going to meet up with her friends from out of town.  Ray
Kelly asked her who her friends were from out of town; to which
she responded: "Are you for real?"  Ray Kelly then said "ohhh"
and asked if they (the friends) were going to be in the city,
referring to San Francisco.  Casee Kelly told him that they would
be in the area.  Your affiant has reason to believe that Casee
Kelly was telling Ray Kelly that she is set to meet with Marlin
Kimbrew, as planned for the purpose of arranging the meeting
between Kimbrew and Shannon to negotiate future drug
transactions.  Agents have obtained records from the Claremont
Hotel in Oakland, California that indicate that Marlin Kimbrew

13

and his girlfriend stayed at the Claremont in Oakland, California the evening of March 4, 2006. The room and charges were paid for in cash. Telephone toll records for the telephone number used by Casee Kelly, indicate that Casee Kelly was in touch with both Kimbrew and Shannon a/k/a OG during the time period Kimbrew was in California.

19. On March 6, 2006, Ray Kelly called Shannon. During the conversation Shannon told Ray Kelly that he had "talked to the board" [Kimbrew] and asked Ray Kelly: "when you were buying those jerseys, [kilograms of cocaine] remember, you all were making them jerseys, [kilograms of cocaine] how much were you charging them [Kimbrew] for the team?" Your affiant believes that Shannon a/k/a OG was asking Ray Kelly what he had previously charged Kimbrew for a kilogram of cocaine. Ray Kelly replied, "like 17" [$17,000}. Shannon a/k/a OG said "17 a jersey, [$17,000 a kilo of cocaine] and then the shorts $12." Ray Kelly said "Yep." Shannon a/k/a OG said I just wanted to make sure cause the way I get the stitching, right, they do the double stitch so it kinda like a little higher. Ray Kelly said that they, referring to Kimbrew, were the only people that he would "let get them like that, cause they were the main sponsors that helped me get the program off the ground. But the other parents . . . I charged them over 20 [$20,000] or something." Your affiant believes that Ray Kelly was telling Shannon a/k/a OG that Kimbrew was the only one he

14

would sell kilograms of cocaine to for $17,000 a kilogram and

that he was charging everyone else $20,000 a kilogram of cocaine.

Shannon a/k/a OG told Ray Kelly that he told them, he, referring

to Kimbrew, "got a lot of teams so let me talk to the people and

I'll get them less than that. It gonna start off at $19 [$19,000

per kilogram of cocaine]. Cause they right there, there ain't too

much leeway like out here where I know people and they can stitch

them up. We just gonna work." Your affiant believes that

Shannon a/k/a OG is telling Ray Kelly that he didn't have any

room to negotiate a lesser price than $19,000 a kilogram of

cocaine. Shannon a/k/a OG said, "They, [referring to Kimbrew],

were happy though. Shannon a/k/a OG said that they, [referring

to Kimbrew] said it's kina steep, we pay more for our other

team." Shannon a/k/a OG told Ray Kelly that he told them "You

gonna come to the game you gonna get in free, there's no risk,

the jersey's [kilograms of cocaine] right there." Your affiant

believes that Shannon a/k/a OG was telling Ray Kelly that he told

Kimbrew that the kilograms of cocaine would be delivered to

Kimbrew and that he did not have to assume any risk in obtaining

them. Shannon a/k/a OG said that they, referring to [Kimbrew],

were supposed to get back to him the next day. Your affiant

believes, based on her training and experience, as well as all

the information obtained as a result of the on-going

investigation that Shannon a/k/a OG was telling Ray Kelly that he

15

had met with Kimbrew and that they had discussed the price of kilograms of cocaine, as being $19,000 a kilogram. During the course of this call, Shannon a/k/a OG asked Ray Kelly what he had previously been charging and Ray Kelly had indicated $17,000 a kilogram. Based on this and other calls and other evidence obtained as a result of the investigation, your affiant believes that prior to being imprisoned, Ray Kelly had been selling kilograms of cocaine to Marlin Kimbrew at $17,000 a kilogram.

20. On March 9, 2006, Ray Kelly called Kimbrew. Ray Kelly asked Kimbrew if he had "talked to the old girl, [Bill] she can holler at you?" Kimbrew told Ray Kelly: "She's cool now. She said my girl want to holler at you. She gave me a hug and felt me all over. She said no disrespect or nothing, I'm just want to make sure you're alright." Your affiant believes that Kimbrew is telling Ray that when he met with Shannon a/k/a OG in California to set up future drug transactions, Shannon a/k/a OG conducted a search of his body for recording devices. Kimbrew also told Ray that the girl told him that she was "gonna come through . . . here." Your affiant believes that Kimbrew was telling Ray Kelly that Shannon a/k/a OG had agreed to supply him with kilograms of cocaine and that he would arrange for the kilograms of cocaine to be delivered to Kimbrew. Kimbrew told Ray Kelly a/k/a OG that he told the girl [Shannon] that "it wasn't going to be as fast as before because of how high it was." Your affiant believes, based

16

on a prior telephone conversation between Kelly and Shannon, that
Kimbrew was referring to the cost of the cocaine, which he
previously received for $17,000 a kilogram and was now to receive
for $19,000 a kilogram. Your affiant believes that in this
telephone call, Kimbrew and Ray were discussing the results of
Kimbrew's meeting with Shannon a/k/a OG; the purpose of which was
to set up future cocaine transactions. Your affiant believes
that Casee Kelly was also present at the meeting with Shannon
a/k/a OG during the course of which Shannon a/k/a OG agreed to
supply Kimbrew with kilograms of cocaine.

21. On March 24, 2006, Ray Kelly called Kimbrew. Ray Kelly
asked Kimbrew if he had heard from "old girl." [Shannon].
Kimbrew told Ray Kelly that "OG" [Shannon] was supposed to come,
but "OG" [Shannon] never come." Your affiant believes that Ray
Kelly was telling Kimbrew that Shannon a/k/a OG agreed to supply
him with kilograms of cocaine but that he, Shannon, had not done
so yet. Ray Kelly asked Kimbrew if he had talked to "OG's" girl.
Kimbrew said that he talked to "Drizzy," who is Casee Kelly, and
that she was supposed to call "OG" [Shannon] and have "OG"
[Shannon] call Kimbrew. Kimbrew told Ray Kelly that "OG"
[Shannon] never called. Your affiant believes that Kimbrew is
telling Ray Kelly that he had not yet obtained any cocaine from
Shannon a/k/a OG yet.

22. On April 2, 2006, Ray Kelly called Shannon. Shannon

17

a/k/a OG stated to Ray Kelly: "My team, the team I assembled, them niggas all got wrapped up." Your affiant believes that Shannon was telling Ray Kelly that the people from whom he was to receive the kilograms of cocaine which he, Shannon, was going to supply to Kimbrew, were having problems. Ray Kelly said: "Cause the board, [Kimbrew] they been ready to holler at you." Your affiant believes that Ray Kelly was telling Shannon a/k/a OG that Kimbrew was ready to purchase the kilograms of cocaine from him. Shannon a/k/a OG said: "I know, I know, and ain't, I lost a lot of money on uniforms and shit, cause I was taking them, those uniforms up there." Your affiant believes that Shannon a/k/a OG was telling Ray Kelly that he knew Kimbrew was ready to engage in the narcotics transaction involving kilograms of cocaine, but that he was experiencing problems and had lost money from a drug transaction. Ray Kelly told Shannon that soon he would have another way to "holler at" him. Ray Kelly told Shannon a/k/a OG that it was going to take him about a week or so but that then they could really talk. Your affiant believes that at this time Ray Kelly, who was allowed to leave FCI La Tuna on work release, and who was unsupervised at the time, was telling Shannon a/k/a OG that he would soon have access to a telephone from which he could call Shannon a/k/a OG and discuss their drug related business freely since the calls would not be tape-recorded. Shannon a/k/a OG said, "I got a few board members numbers, I

18

gonna wait until Tuesday or Wednesday and give them a call and
let them know I'm assembling another team.   Then I'm gonna go out
there and meet with them."   Ray Kelly agreed.   Your affiant
believes that Shannon a/k/a OG was telling Ray Kelly that he had
a new source of supply for cocaine and was going to meet with his
source of supply and tell them that he had a new person [Kimbrew]
to supply the cocaine too.   Ray Kelly talked about a visitor, who
he had that weekend, who told him that he, Shannon a/k/a OG, got
the "little Jacynta," referring to Jacynta Jordan, on his
"squad."   Records obtained from FCI LaTuna indicate that the
visitor was Jamica Walker.   At the conclusion of this
conversation, Ray Kelly told Shannon that he would let the "board
people" [Kimbrew] know that Shannon was going to call them.
Your affiant believes that Ray Kelly and Shannon were discussing
the cocaine transaction that Ray Kelly was trying to arrange
between Shannon and Kimbrew.   Your affiant further believes that
Ray Kelly was telling Shannon that Kimbrew was ready to deal and
Shannon was explaining why he had not been able to supply the
cocaine yet.   Your affiant believes that Jacynta, who your
affiant believes is Jacynta Jordan, was an individual Shannon
a/k/a OG  had recruited to assist him in his narcotics business.
As will be discussed in further detail below on June 15, 2006,
Kimbrew mailed a package containing $255,770 to J. Jordan.

     23.   On April 4, 2006, Ray Kelly called Marlin Kimbrew.   Ray

19

Kelly told Kimbrew that he talked to "OG" [Shannon] and that
everything was straight. Ray Kelly told Kimbrew that he,
referring to Shannon, got held up because "some of the people he
know, they tried out for the Baltimore Ravens so he had 'til free
agent camp was over." Ray Kelly told Kimbrew that Shannon was
going to talk to his agent and to a different camp, "Baltimore
Ravens, you know how they act?" Ray Kelly told Kimbrew that
Shannon told him that everything was "gravy." Kimbrew said okay,
and Ray Kelly told him that he, referring to Shannon, was going
to call him.  Your affiant believes that in this call Ray Kelly
was telling Kimbrew that the deal for kilograms of cocaine was
still on and that Shannon was in the process of contacting a
different supplier for the cocaine.

24. Your affiant further knows that on April 11, 2006, Ray
Kelly provided a girlfriend with an address in El Paso, Texas to
send something to. Your affiant believes that in this call Ray
Kelly was telling his girlfriend where to send a cellular
telephone. Based on subsequent calls between Ray Kelly and his
girlfriend, which occurred on April 15, 2006, in which the
girlfriend told Ray Kelly that she sent it and he should get it
on Monday, and on June 3, 2006 and June 11, 2006, during the
course of which Ray Kelly told the girlfriend to contact Marlin
and tell him on the first occasion that someone had dropped the
phone into the water, and the second occasion that the minutes

20

were getting low, your affiant believes that Ray Kelly's girlfriend did send the telephone and that the telephone had been supplied by Marlin Kimbrew. On January 25, 2007, your affiant executed a search at Kimbrew's residence in North Huntingdon. As a result of the search, your affiant recovered among other things a letter from Ray Kelly to Kimbrew instructing Kimbrew to obtain a cellular telephone and mail it to Ray Kelly's girlfriend because the girlfriend was coming to visit Ray Kelly. As indicated above your affiant believes that the telephone sent by Kimbrew to Ray Kelly's girlfriend and subsequently sent by the girlfriend to Ray Kelly was Verizon Wireless d/b/a Page Plus cellular telephone number (412) 779-8276. Between April 28, 2006 and June 28, 2006, Ray Kelly used this telephone to call numbers used by Marlin Kimbrew, Casee Kelly and William Shannon.

25. On May 7, 2006, there was a recorded telephone call between Ray Kelly and Jamica Walker. During this call Jamica Walker and Ray Kelly talked about an individual by the name of "Pep," who your affiant has identified as Edward Warren. Jamica told Ray Kelly that Jacynta had a line, that is a telephone number for "Pep." Ray Kelly asked Jamica if "Pep" was trying to get with Jacynta. Jamica Walker told Ray Kelly that Jacynta had told her that "Pep" was trying to get with her, but that she told Pep, "no I mess with Bill (Shannon)." Ray Kelly told Jamica Walker not to let Jacynta or anyone else know his business. Your

21

affiant believes that Ray Kelly and Jamica Walker were discussing Jacynta Jordan.

26. On May 13, 2006, Ray Kelly asked Jamica Walker is she talked to Bill (Shannon). Jamica said no. Ray Kelly told Jamica Walker he wanted her to get a hold of Bill (Shannon). It is believed from prior conversations that Ray Kelly wanted Jamica Walker to contact Shannon for the purpose of obtaining air fare so that she could visit him in El Paso. During this call, Jamica Walker indicated that she knew Shannon was around because Jacynta was just with him. Your affiant believes that Jacynta is Jacynta Jordan.

27. On June 14, 2006, Ray Kelly asked Casee Kelly if she had gone to the "spot" and if it was all "gravy." Ray Kelly and Casee Kelly also discussed whether Casee Kelly had talked to "Tonda" who your affiant believes is Marlin Kimbrew. Ray Kelly also asked Casee if she could have that information for "Tommy in the morning," because he had to tell her something too, because he changed something, not out there but closer to him. Your affiant knows that Ray Kelly uses the name "Tommy" to refer to himself. At the end of this call, Ray Kelly said that was all unless Casee had information for Tommy so he could check his statements and make sure he got everything he was supposed to get.

28. On June 15, 2006, DEA Task Force Officer Edward J.

22

Walker seized a United Parcel Services (UPS) which had several
narcotic shipper indicators. Walker applied for and was granted
a search warrant for the suspect parcel. The parcel was found to
contain $255,770.00 in United States currency.

29.  Subsequent investigation, indicated that on June 15,
2006, at approximately 3:45 p.m., an unknown black male arrived
at the Mail Priority Center, 8775 Norwin Avenue, North
Huntingdon, Pennsylvania.  The unknown male, who identified
himself as "Joe Smith," was later identified as Marlin Kimbrew.
Kimbrew a/k/a Joe Smith told the employee of the Mail Priority
Center that he wanted  to ship a parcel overnight to 2601
Tipperary Avenue, South San Francisco, California.  The package
that Kimbrew wanted sent was approximately 18" x 18" x 16" and
was heavily taped on all the seams.  The package weighed
approximately 37 pounds and the employee told Kimbrew a/k/a Smith
that it would cost $208.76 to ship overnight.  Kimbrew a/k/a
Smith agreed and paid the fee with cash, using $20.00 bills.
Kimbrew a/k/a Smith filled out the address label and identified
himself as Joe Smith, the sender.  Kimbrew a/k/a Smith addressed
the package to J. Jordan, 2601 Tipperary Avenue, South San
Francisco, California.  Kimbrew a/k/a Joe Smith declared the
package as having the value of $100.00.  The employee placed the
package behind the counter.  Kimbrew a/k/a Joe Smith then asked
for the package tracking number and was provided with UPS

23

tracking number, IZ943A8ENT48917181. Kimbrew a/k/a Smith left
the store and entered the driver's side door of a dark colored
Cadillac Escalade. Kimbrew a/k/a Smith drove from the parking
space, but returned several minutes later. Kimbrew a/k/a Smith
came back into the Mail Priority Center and asked if there was
any way the package could arrive in South San Francisco any
sooner. The employee told Kimbrew a/k/a Smith that it could
arrive a little sooner for an additional charge of $40.00.
Kimbrew a/k/a Smith decided the package was fine the way it was
presently being shipped. Kimbrew a/k/a Smith then left the
store.

30. On June 15, 2006, at approximately 4:00 p.m., the
employee, at the Mail Priority Center who had dealt with Kimbrew
a/k/a Smith, contacted a second employee of the Mail Priority
Center and advised that individual of the suspicious activity.
The second employee decided to open the package, as is the
Center's right, consistent with its terms of business with UPS,
to inspect any and all parcels being shipped through the
business. The two employees opened the package and discovered two
Honey Nut Cheerios boxes, taped on the seams, along with the
Cheerio's box contents (two plastic bags containing Cheerio's)
surrounding the two Cheerios boxes. The employees decided that
the package may contain something illegal, therefore they stopped
from opening the two Cheerio boxes and contacted their local

24

police department, the North Huntingdon Police Department. Your affiant has obtained records from Sams Club that indicates that on this date at 12:06 p.m., Marlin Kimbrew purchased approximately $26.76 worth of Honey Nut Cheerios at a Sams Club located in Monroeville, Pennsylvania.

31.  On June 15, 2006, at approximately 4:21 p.m., Officer Thomas Harris, North Huntingdon Police Department arrived at the Mail Priority Center and observed the suspicious package. Officer Harris contacted Pennsylvania State Police Corporal Kirk Nolan, a K-9 narcotics handler and requested assistance. Corporal Nolan responded to the Mail Priority Center, at which time a specially trained narcotics detection dog alerted to the presence of a controlled substance from within the package.

32.  The North Huntingdon Police Department contacted DEA Pittsburgh and requested assistance with the investigation. A bogus package filled with reams of paper was prepared and sent via the UPS system for routine delivery. The bogus package was sent in order to disguise the interception of the package by law enforcement should Kimbrew a/k/a Smith track the package.

33.  On June 15, 2006 at approximately 9:20 p.m., based on the narcotic dog alert and numerous narcotic shipper indicators, TFO Walker applied for and obtained a search warrant. Thereafter the package was searched and the currency was located. Several partial fingerprints were recovered and submitted for analysis.

25

On January 25, 2007, your affiant obtained fingerprints and palm prints from Marlin Kimbrew. On January 26, 2007, a fingerprint examiner compared Kimbrew's prints with the fingerprints recovered from the packaging of the currency, and determined that all four fingerprints on the packaging were Kimbrew's.

34. On June 16, 2006, at approximately 8:58 a.m. (PST) time the bogus package was delivered. Your affiant knows from telephone records that at 9:00 a.m. (PST) there was a telephone call lasting approximately 35 seconds from (415) 740-7913 to (415)720-5878, which is the known telephone number of William Shannon. Your affiant has further determined that the telephone number (415) 740-7913 is subscribed to a Louise Geeter at 45 Neptune Street, San Francisco, California. Based on publicly available records your affiant also knows that Jacynta Jordan is associated with this address. At 9:19 a.m. (PST) there was a return call lasting over a minute from (415)720-5878, a telephone being used by Shannon to (415) 740-7913, a telephone believed to be used by Jacynta Jordan. DEA Special Agent Michael Tolliver and other DEA Agents conducted interviews of the occupants at 2601 Tipperary Avenue, including Jacynta Nameka Jordan, Audry Jordan and an unknown black female. All occupants denied knowledge of the package. Your affiant further knows that on June 16, 2006 there were a total of 24 telephone calls between the number known to be used by William Shannon and the telephone

26

number believed to be used by Jacynta Jordan. As indicated above in paragraph 22 of this affidavit, on April 2, 2006, Ray Kelly had a conversation with Shannon, during the course of which Ray Kelly told Shannon that he had heard that "little Jacynta" was on Shannon's team, and Shannon acknowledged that she was. Your affiant knows that it would have been around 12:00 noon Eastern Standard Time at which time the package would have been delivered to J. Jordan in San Francisco. It would have been sometime thereafter when Kimbrew would have found out the money in the package had been seized.

35.    On June 16, 2006, at approximately 5:47 p.m. Kimbrew a/k/a Joe Smith, returned to the Mail Priority Center. A representative of the store, who observed Kimbrew at that time, advised that he appeared to just walk aimlessly around. Kimbrew eventually walked to the counter and purchased a small box of paper clips with cash. As Kimbrew a/k/a Smith was leaving the store, he made a comment about the display boxes on the floor of the store. The representative of the store then observed Kimbrew a/k/a Smith receive a call on his cellular telephone. Kimbrew appeared frustrated with the caller and was overheard describing the display boxes on the floor of the Mail Priority Center, including all markings and writings on the box, to the unknown person on the mobile telephone. Immediately after Kimbrew a/k/a Smith left the Mail Priority Center, the representative from the

27

store who had observed him, contacted the North Huntingdon Police Department and described the actions of Kimbrew. That same representative also described the vehicle Kimbrew was driving as a silver/grey Subaru small sport utility vehicle with a Pennsylvania temporary registration plate. On June 16, 2006, the vehicle was observed in the vicinity of the Mail Priority Center and followed. The temporary registration number, GHN-6601, was observed by the Police on that vehicle. A check with the Pennsylvania Department of Transportation determined that the vehicle was registered to Hamilton Mazda. A representative of Hamilton Mazda indicated that the Subaru was a rental car from the dealership and was rented to Marlin Kimbrew.

36. On June 16, 2006, at approximately 6:15 p.m., a North Huntingdon Police Department Sergeant drove by Kimbrew's residence at 741 Stonebridge Drive, North Huntingdon, Pennsylvania. At that time the Sergeant observed a green Cadillac Escalade, matching the description of the vehicle observed on June 15, 2006 at the Mail Priority Center, parked in the garage of the residence.

37. On June 16, 2006, Ray Kelly telephoned Casee Kelly. At the time Casee Kelly was in El Paso, Texas, and was planning to visit Ray Kelly at the prison the following day. Casee Kelly told Ray Kelly that she got this "crazy call." Ray Kelly asked her "from whom?" When Ray Kelly said "You know um," Ray Kelly

28

said "Tonda,?" [Marlin Kimbrew] Casee Kelly said no and then said "OG." [Shannon] Ray Kelly asked her "Uncle?" [Shannon] and she said yes. When Ray Kelly asked Casee Kelly what happened she told him she didn't know because "she," referring to Shannon, didn't say. Casee Kelly told Ray Kelly that she would tell him the next day. Ray Kelly asked Casee Kelly if it was "something bad" and she said that she thought so. Ray Kelly asked her "As far as what? To somebody, something happened bad to somebody?" Casee Kelly said while I guess him, referring to Shannon. Ray Kelly asked Casee Kelly "Like who did it to him?" She said: "Who else." Ray Kelly then said "Tonda" [Marlin Kimbrew] and Casee Kelly said she thinks so. Ray Kelly implied that "OG" [Shannon] left a message that said, "Whatever the price of the ticket, whatever, I need to talk to you today." Ray Kelly asked Casee Kelly the price of the ticket to come where. Casee Kelly told Ray Kelly "there." [San Francisco] Ray Kelly replied: "Back home?" [San Francisco]. Casee Kelly said yes. Casee Kelly said the "OG," referring to Shannon, told her that on a scale of 1-10, it's an 11. Ray Kelly asked her if anyone was in trouble. She said that she did not think so and that they thought she was in L.A. Ray Kelly asked her if they told her something that she could tell him tomorrow. Casee Kelly told him: "yes." Casee Kelly also told Ray Kelly not to call anyone until she talked to him in person. Your affiant believes that in this call Casee

29

Kelly was telling Ray Kelly that Shannon had contacted her and told her something bad had happened.  Your affiant further believes that Shannon had called Casee Kelly to discuss with her the fact that the money sent by Kimbrew for a shipment of kilograms of cocaine had not reached him.  Your affiant  believes that Casee Kelly was telling Ray Kelly that Shannon thought that Kimbrew was responsible for the missing money.

38.  On June 16, 2006, after talking to Casee Kelly, Ray Kelly called Shannon.  Ray Kelly asked Shannon what was going on and told him that he, Ray Kelly had talked to "wifey."  Shannon told Ray Kelly that he thought it was the other situation with the boy.  Shannon told Ray Kelly that he needed some people to "build on his house" so he sent them [Kimbrew] the "tubes" [kilograms of cocaine] and they did not pay him for the "tubes," [kilograms of cocaine] and that was what he thought.  He asked Ray Kelly if he knew the people who worked on his house, they came through and that's who it was. Shannon then said "You know them people who worked on your house?" Ray Kelly replied: "Yeah. Your affiant believes that Shannon was referring to DEA Agents who had previously arrested Ray Kelly.  Shannon said: "Yeah, them the same people who came through.  Your affiant believes that Shannon is referring to the DEA Agents who questioned Jacynta Jordan and the other occupants of 2601 Tipperary Avenue, South San Francisco, California about the package that had been seized

30

and which contained $255,770. They charged me like um 255."
Your affiant believes that Shannon was telling Ray Kelly that the
DEA had seized the money Kimbrew had sent him for the cocaine.
Ray Kelly said "for ahh" and Shannon interrupted him and said:
"for work on the kitchen and all that shit." Ray Kelly asked:
"They did the modern cabinet and everything?" Shannon replied:
"Yep." Your affiant believes that Shannon is telling Ray Kelly
that he lost $255,000 which was to be paid to him for the
kilograms of cocaine that he had supplied Kimbrew. Ray Kelly
said: "what did they say though, they say something?" Shannon
said: "My folks who hooked up with them was just like they doing
a routine inspection." Your affiant believes that Shannon was
telling Ray Kelly that the individuals who had been questioned by
the DEA, including Jacynta Jordan, had told him that the agents
who discovered the $255,000 were just doing a routine inspection.
Shannon then told Ray Kelly: "There might have been something
else involved from back east with the shipment," referring to the
$255,770 that Kimbrew had attempted to send him for kilograms of
cocaine. Shannon said that when he talked to "the people"
[Kimbrew] that he [Kimbrew] said that they were following him
[the police] while they [Kimbrew] were talking on the phone, but
that he drove into "the hood" [McKeesport] and managed to lose
them [the police]. Your affiant believes that Shannon was
telling Ray Kelly that based on a conversation with Kimbrew that

31

law enforcement officers in Pennsylvania may have connected the
money to illegal activity. Ray Kelly asked Shannon what was the
estimate on the work. Shannon said the estimate was "255,
[$255,000] but they were to charge 255 [$255,000] up front and
the 290, [$290,000] um later on, just for the cabinets [kilograms
of cocaine], the 290 [$290,000] is still up in the air." Ray
Kelly said that he was "kinda lost right there." Shannon said:
"Okay, they did the work, [supplied kilograms of cocaine] right,
they did ½ the work and they charged me 255, [$255,000] right,
255 [$255,000] is what, you know they wanted. So I never gave
them that cause it never made it. You understand?" Your affiant
believes that Shannon was telling Ray Kelly that his suppliers
gave him 15 kilograms of cocaine for which he was to pay them
$255,000 but that he never paid for the 15 kilograms of cocaine
because the $255,000 never made it to him.  Ray Kelly asked
Shannon if he explained everything to the "girl who you said you
love," referring to Casee Kelly. Shannon told him yes. Shannon
told Ray Kelly how he thought that someone had ripped him off,
but that when he "talked to his people here, the people who was
doing the inspection came to the house. . . the inspectors came
to the house." Your affiant believes that Shannon was telling
Ray Kelly that he originally thought that Marlin Kimbrew had
stolen the money Kimbrew had sent him for the cocaine, but then
he found out that DEA agents had gone to the house where the

32

money was sent and he no longer believed that.    Ray Kelly asked
what the inspectors said.  Shannon said, "It didn't pass."  Ray
Kelly asked:  "When it didn't pass inspection, was the people
like we want to try again, or we'll go to someone else?"  Shannon
told Ray Kelly that it was a routine inspection and that they did
not say anything about the money.  Shannon said but just to make
sure he was going to have his attorney stand by and hit them up
tomorrow.    Your affiant believes that Shannon is referring to
the DEA Agents, who went to the house where Kimbrew sent the
$255,770 and talked to Jacynta Jordan and other members of her
family.    Shannon said he could not pay for no work which "ain't
been done right."  Ray Kelly asked Shannon if he had talked to
the "people on the board," referring to Kimbrew.    Shannon said
that he had, "but initially he didn't want to hear what they had
to say cause when [he] opened up the cabinets, man it was all
bad. . . wood was rotted and everything, wrong color."  Your
affiant believes that Shannon was telling Ray Kelly that he did
talk to Kimbrew, but that he had not initially wanted to because
when he opened up the package Kimbrew sent him that was supposed
to contain $255,000 for kilograms of cocaine Shannon had supplied
Kimbrew, the box was empty of money.  Ray Kelly repeated that he
wanted to make sure that Casee Kelly had all the information for
when she visited him the following day.  Ray Kelly asked Shannon
if she, referring to Casee Kelly, knew the exact figures and

33

everything.  Shannon told Ray Kelly "no, you do."  Ray Kelly
said, he had heard it but that he wasn't sure.  Shannon told Ray
Kelly: "255 [$255,000] that was owed for the work [kilograms of
cocaine], for them putting the cabinets together, right?  The
payment never made it.  Then the inspectors [DEA Agents] came out
and they just doing a routine inspection.  The 290 [$290,000]
still ain't paid yet."  Ray Kelly said that that was the part
that he was kinda confused on.  Ray Kelly told Shannon to holler
at home team [Casee Kelly] so when she [Casee Kelly] sees her
dude [Ray Kelly] she [Casee Kelly] will have all the information.
Shannon said that he "was just leaving my folks who got all the
building materials [the suppliers of the cocaine], you know?" "I
really gotta probably go back tomorrow with something to protect
myself [money] cause they [the suppliers of the cocaine] want to
get paid for their building materials [kilograms of cocaine].  I
didn't get them all from him.  I paid for . . ." Kelly
interrupted and asked, "how many square feet of tile [kilograms
of cocaine] did they have?"  Shannon said, "Just a little room,
just 30 square feet [30 kilograms of cocaine].  Just a little
room, but it's all bad."  Kelly said that after he talked to "Old
girl" [Casee Kelly] that he was going to call "the board [Marlin
Kimbrew]."  Ray Kelly told Shannon that he wondered if they
[Kimbrew] knew.  Shannon told Ray Kelly that the "board [Kimbrew]
went back to read some shit, you know what I'm saying, you

34

following me?" Ray Kelly said yes. Shannon told Ray Kelly that
the "board [Kimbrew] went back to read some shit and they was
like this ain't right." Shannon told Ray Kelly that he was sick
because that's two times his house, both of his houses were
getting work on them and it was just fucked up big time. Your
affiant believes that Shannon was referring to two transactions,
the current one with Kimbrew and another one with someone else,
where he had not been paid the money for the kilograms of
cocaine. Ray Kelly told Shannon that he would talk to "Old Girl"
[Casee Kelly] and then he would call Shannon on Monday. Your
affiant believes that Shannon and Ray Kelly were talking about
the $255,770, which was to have been sent by Kimbrew to Shannon
to pay for a shipment of cocaine and which was intercepted and
seized by DEA. Your affiant also believes that the shipment
involved at least 15 kilograms of cocaine and possibly as many as
30 kilograms and that Kimbrew still owed Shannon $290,000 for 15
kilograms of cocaine.

39. Your affiant further knows that during the time period
June 17-18, 2006, Casee Kelly was in El Paso, Texas and that
during that period of time she visited with Ray Kelly at FCI La
Tuna. Your affiant further knows that while in El Paso, Casee
Kelly called Marlin Kimbrew on approximately 12 occasions. Your
affiant believes that Casee Kelly was calling Marlin Kimbrew on
behalf of Ray Kelly to find out what Marlin Kimbrew knew about

35

the seizure of the $255,770, which had been sent by Kimbrew to Shannon to pay for 15 kilograms of cocaine.

40.   Your affiant also knows that between June 19, 2006, and June 20, 2006, there were calls between Kimbrew and the prepaid telephone being used by Ray Kelly. Your affiant believes that Ray Kelly, was calling Kimbrew to find out what Kimbrew knew about the seizure of the $255,770, which had been sent by Kimbrew to Shannon to pay for 15 kilograms of cocaine.

41.   Your affiant knows that on July 6, 2006, Ray Kelly called Casee Kelly. During the course of this call, which was recorded, Ray Kelly told his Casee Kelly that he "talked to Tommy [referring to himself], they switched his job at the Y, he's not the sports coordinator anymore, so he can't holler at anyone any more." Ray Kelly also told Casee Kelly that he didn't know if it was temporary or permanent and he would know in two weeks.  Ray Kelly told Casee Kelly to call an individual who your affiant believes is Shannon and two other people, whose names were unintelligible and let them know.  Your affiant knows that just prior to this call, Ray Kelly's work release status was terminated.  Your affiant believes in this call Ray Kelly was telling Casee Kelly to call Shannon and Kimbrew and let them know that he was no longer being permitted to leave FCI La Tuna on work release and therefore could not call anyone on the pre-paid telephone he had previously been using since he no longer had

36

access to it.  Your affiant further believes that Ray Kelly had

been using the pre-paid cellular telephone to engage in drug

related conversations with Shannon and Kimbrew and others because

those conversations were not being recorded.

42.  Your affiant knows that on July 10, 2006, Ray Kelly

called Marlin Kimbrew.  The call, which was placed from FCI La

Tuna, was recorded.  During the course of this call, Ray Kelly

asked Kimbrew if Stop-n-Drizzy, who your affiant knows is Casee

Kelly, told him why he hadn't been able to talk to him.  When

Kimbrew said no, Ray Kelly told Kimbrew, she, referring to his

wife, would tell him.  Ray Kelly then asked Kimbrew "what's going

on with that other thing?", referring to the cocaine transactions

engaged in between Kimbrew and Shannon.  The call then became

disconnected.  Your affiant believes, based on the evidence

obtained in the investigation thus far, that Ray Kelly was trying

to find out if Casee Kelly had told Kimbrew that he, Ray Kelly,

would no longer be able to call Kimbrew on the pre-paid

telephone.  Your affiant also believes that Ray Kelly was asking

Kimbrew what was going on with the drug transaction Kimbrew and

Shannon previously had engaged in.

43.  On July 12, 2006, Ray Kelly called Shannon.  The call,

which was made from FCI La Tuna was recorded.  During the course

of this call, Ray Kelly asked Shannon if "wifey," referring to

Casee Kelly, gave him his message.  When Shannon replied that she

37

had not, Casee Kelly, referring to himself, as if he was talking about someone else, told Shannon "his little position changed .... down at his employment so . . . he said that's why he ain't been able to holler at you . . . cause he don't even have access to that other thing he was telling me." When Shannon replied: "so he can't get out no more?" Ray Kelly responded: "Nah, but he said he don't know if its going to be temporary or permanent. I talked to him yesterday, but for right now he said they changed it to a different spot so he can't even go down there right now." Your affiant believes that in this portion of the conversation, Ray Kelly was telling Shannon that he couldn't call him from the prepaid telephone anymore because he was no longer being released for work. Your affiant also knows that based on your affiant's conversations with a representative of FCI La Tuna, Ray Kelly was denied work release as of early July.

44. During this same telephone call, Shannon told Ray Kelly that: "I was going to hit the board, [referring to Kimbrew] have a meeting with the board, [referring to Kimbrew] right. But I'm having a problem with the people with the uniforms [the suppliers of the cocaine which he had supplied Kimbrew and for which he could not pay because the money had been seized by DEA] . . . They [the suppliers of the cocaine] have a big problem. They think I stole the kids' uniforms [the cocaine] . . . I'm going to set up a meeting with them [the suppliers of the cocaine]

38

probably like tomorrow morning . . . But with them uniforms [the cocaine] I got a get that cleared up. . ." Ray Kelly then told Shannon that he knew "the tops got messed up," [the $255,000} but did he "ever get the shorts?" [the $290,000]. Shannon replied: "yeah I got the shorts [the $290,000] its still a few shorts missing. I ain't worried about it. But at the same time . . . they [the suppliers of the cocaine for which he could not pay] talk'n about like, you know, doing something to my family. . ." When Ray Kelly asked Shannon: "and they still talk'n that noise as of today," Shannon replied " oh man, as of today." Your affiant believes that Shannon is telling Ray Kelly that the individuals who supplied him the 15 kilograms of cocaine, which he supplied Kimbrew and for which he could not pay, were threatening to harm his family. Shannon then said: "but, I'm going to get with them [the suppliers of the cocaine] like early in the morning before I leave out . . . I'm trying to get this paper man to show them [the suppliers of the cocaine] that I paid for them." Shannon then said that: ". . . I'm trying to get this paper. I'm trying to wait, it usually takes about a month. . . So if I can get that paper it will ease up the pressure a little bit." Ray Kelly asked Shannon what the "board [Kimbrew] tellin, they [Kimbrew] still supporting everything, everybody." Shannon replied that: "like I ain't really talked to the board [Kimbrew] because it ain't really nothing, I'll just be stressed out. . .I

39

really ain't been feeling . . . but I was going to call them
[Kimbrew] today. . . just to touch bases." Ray Kelly told
Shannon because the last time he "had talked to the board"
referring to Kimbrew, they were telling him that they were "going
to do what they can to help." Shannon said but "it ain't even
like that" and that Ray had to be there "to feel" his
"situation." Ray Kelly said that his "thing was that is the
coach [Shannon] going to be alright, is he going to be there to
take care of everything," referring to future cocaine
transactions to be conducted between Shannon and Kimbrew. Shannon
said that was what he was "going to find out tomorrow. . .If not,
I can't have nobody threatening my family over no *** jerseys
[kilograms of cocaine and/or the money owed for them]. I gotta
do what I can to protect my family . . . but I ain't no violent
cat, I don't want nothing to happen. . ." Ray Kelly said that he
was just calling to check because it was on his mind everyday.
Shannon said that he wished he "could keep the team [keep
supplying Kimbrew with kilograms of cocaine] rolling." Ray Kelly
said that Shannon had to take care and that they had time and
that every road have "a bump in the road." Shannon said " oh,
this was no bump, this was a hill," referring to the seizure of
the $255,770 which Kimbrew had sent him for kilograms of cocaine
and which had been seized by DEA. Ray Kelly said "the board,
[referring to Kimbrew] I think they [Kimbrew] see even though

40

[he's] gone, they see it's good for the program, its good for the community and they know that we can keep the program going...," referring to the supplying of cocaine to Kimbrew by Shannon. Shannon then told Ray Kelly that the "board" [Kimbrew] had told him something that "scared" him. "There were some new board members come'n on that wasn't cool, board members wasn't cool and they gone now, something happened, I don't know what happened. Scared the shit out of me, man." Ray Kelly told Shannon that every time he talked to Casee Kelly, he told her to hit his folks.. . " Shannon told Ray Kelly that she, referring to Casee Kelly had hit him up Monday and "told him that the board members [Kimbrew} were looking for him, there was something they wanted," and he told her [Casee Kelly] he was going to "hit them up." referring to Kimbrew. Your affiant believes that in this conversation Shannon was telling Ray Kelly that the suppliers of the cocaine were threatening him because they thought he had stolen the kilograms of cocaine, which had been sent by Shannon to Kimbrew. Your affiant also believes that when Shannon told Ray Kelly that he had received the "shorts," he was referring to the $290,000 that money which Kimbrew owed Shannon for 15 kilograms of cocaine; money which was not seized on June 15, 2006, but which had made it through to Shannon. Your affiant further believes that when Ray Kelly refers to the "board" in this call, he is referring to Marlin Kimbrew and that Kimbrew had

41

told Ray Kelly that they would do what they could do to help

Shannon to make up for the seized $255,770. Your affiant further

believes that Ray Kelly was telling Shannon that Kimbrew was

still interested in obtaining cocaine from Shannon and Shannon

acknowledged that Casee Kelly had called him and had told him

that Kimbrew wanted to talk to him. Your affiant also knows that

shortly after this telephone call, Ray Kelly was caught with

contraband inside FCI La Tuna, as a result of which he was denied

telephone privileges for a period of six months.

45. On September 9, 2006, Casee Kelly asked Ray Kelly if

she could send a cashier's check instead of a money order. Casee

Kelly also told Ray Kelly that she got "two big ones" from Bill,

who your affiant believes is Shannon. Ray Kelly told Casee Kelly

he had tried to get at Shannon at his address but he thought it

was going to be shut down. Ray Kelly also told Casee Kelly that

he wrote her a letter with "Tonda's" phone number in it. Casee

Kelly told Ray Kelly she had talked to "Tonda" on the telephone.

Your affiant believes that "Tonda" is Kimbrew.

46. Your affiant knows further that on December 1, 2006,

Shannon flew to Pittsburgh and checked into the Hyatt Hotel at

the Pittsburgh International Airport. That evening surveillance

agents observed Kimbrew arrive at the hotel and pick up Shannon.

Surveillance agents subsequently lost sight of Kimbrew and

Shannon in the Oakland area of Pittsburgh. Your affiant also

42

knows that Shannon flew back to San Francisco the following day.

47.   On December 4, 2006, Ray Kelly called Kimbrew.  During the course of this call, Kimbrew told Ray Kelly that he was expecting a settlement check from a lawsuit and would send Ray Kelly $3000-$4000.  Later Kimbrew changed the number to $1500. In that same conversation, Ray Kelly asked Kimbrew if Kimbrew got his letters, and Kimbrew acknowledged that he did get one.  Ray Kelly also asked Kimbrew if he got a new cellular telephone number, but Kimbrew told him that it wasn't a number Ray Kelly could put on his prison calling list. Kimbrew told Ray Kelly that "Henny  came through," referring to Shannon, and "Baltimore," referring to the police were all over the place."  Kimbrew also told Ray Kelly that somebody saw the whole thing and told him. Kimbrew told Ray Kelly that he told "Henny," referring to Shannon, to go on back. When Ray Kelly asked Kimbrew if they ended up taking the hit on that, Kimbrew replied "no, nothing." Kimbrew said that Shannon came through to holler at him.  Kimbrew told Ray Kelly that Shannon, himself, actually came through.  Ray Kelly asked Kimbrew what made "Baltimore," referring to the police, come on out.  Kimbrew said that "Tonda," referring to the police, had been checking his answering machine, his messages and shit.  Kimbrew said he called the Old Girl he met in Chili's, referring to Casee Kelly, from his home number and that he thinks the police had that number.  He said he then called her from

43

another number that was good, one that the police did not know, but he thinks the police looked at the records and checked that number out as well.  When Ray Kelly asked Kimbrew if he thought they were on the girl he met at Chili's too, referring to his wife, Kimbrew said no, that they, the police, were watching him. Kimbrew also told Ray Kelly that "Henny," referring to Shannon, only stayed out there a short time.  Kimbrew said he was in love with her and that he wished there was a way he could check and see if she got home because he was supposed to drive her back home but that "Tonda," referring to the police, were on him so strong that he couldn't drive her back home.  When Ray Kelly asked Kimbrew why he didn't go out to where "Henny," referring to Shannon, was, Kimbrew responded that he didn't know that she, Shannon, was coming.  When Ray Kelly asked Kimbrew how did she, referring to Shannon, know where to come to, Kimbrew said she, referring to Shannon, just called him and said he was there. Kimbrew, referring to the prior drug deal, said he hit that thing so nice that she, referring to Shannon, was in love with him. Ray Kelly, referring to Shannon , asked Kimbrew if Old Girl was cool because he knew that Shannon's man, referring to the supplier of the cocaine, were sweating him about the numbers; referring to the money that had previously been seized.  Kimbrew told Ray Kelly that all that was worked out in a good way, referring to the fact that Shannon was on good terms with his

44

suppliers again. When Ray Kelly asked Kimbrew if Stop and Drop, referring to Casee Kelly, worked that out, Kimbrew said yeah, but he had to do different things. Kimbrew then said that "Tonda," referring to the police, were on him strong because she, referring to the police found some "checks and receipts," referring to the money that had been seized, and that she, referring to the police, had been on him ever since. Ray Kelly told Kimbrew that it was like the police knew that Kimbrew was dealing, and that they just had to catch him at it because they couldn't prove it. Your affiant believes from this conversation, as well as other evidence obtained during the investigation, that Shannon had come to Pittsburgh to set up another drug deal with Kimbrew, but that the deal did not go through because Kimbrew had become aware that law enforcement agents were conducting surveillance of him. As a result of this call, your affiant also believes that Kimbrew and Shannon were able to resolve the issue of the seized money that was causing problems with Shannon's suppliers and that those suppliers were now willing to supply Kimbrew with additional kilograms of cocaine.

48. On December 4, 2006, Ray Kelly also called Shannon. Shannon told Ray Kelly that he tried to start the "basketball team" back up. Ray Kelly, referring to his previous call with Kimbrew, said that he heard that they had a "board of directors'" meeting, but then the peoples started acting funny. Shannon

45

said that he didn't believe that they was acting like that until
he went to the meeting and saw for himself. Shannon said he saw
the people, referring to the police. When Ray Kelly said he
wondered how "they," the police knew, Shannon said he didn't
know. Shannon said that had he known that "they," referring to
the police, were "tripp'n like that," he wouldn't have gone to
the meet. Shannon told Ray Kelly that Kimbrew told him that
Kimbrew had told the "old coach wife," referring to Casee Kelly,
how they were acting, but that she had not told him and he didn't
know what to expect. Your affiant believes that Shannon and Ray
Kelly were discussing Shannon's trip to Pittsburgh and the
results of his meeting with Kimbrew. Ray Kelly and Shannon were
cut off during this call.

49. Subsequently, on December 4, 2006, Ray Kelly called
Shannon back and they continued to discuss the results of
Shannon's trip to Pittsburgh. Ray Kelly said he didn't know how
them people, referring to the police, knew when the "board,"
referring to Kimbrew, was having their meetings. Shannon said he
didn't know either and if he did he wouldn't have gone and that
he was shook up. Ray Kelly and Shannon then discussed the prior
kilogram deal for cocaine, during the course of which the money
was seized and the fact that the suppliers of the cocaine had
been upset with Shannon over the loss of the money. Shannon told
Ray Kelly that the suppliers were no longer upset because they

46

had gotten "insurance," and the "board," referring to Kimbrew,
had said they were willing to help. Shannon, referring to his
suppliers as doctors, said that they were still willing to do the
"surgery," that is supply Kimbrew with cocaine, and that he was
going to have to talk to them. Shannon said the "doctors,"
referring to his suppliers, didn't understand and that they were
"greedy."

50.     On January 16, 2007, Ray Kelly called Kimbrew. At
that time Kimbrew told Ray Kelly that he was planning to come to
the FCI La Tuna and visit Ray Kelly the week of January 29, 2007.
Your affiant believes that Kimbrew intended to travel to Los
Angeles, California first.

51.     During the course of this investigation your affiant
has also obtained evidence that Ray and Casee Kelly have been
laundering the proceeds of their drug trafficking activities.
Your affiant has reviewed suspicious activity reports filed by
the United States Postal Service which indicates that during the
time period February 23, 2005 to June 2, 2005, which is
subsequent to Ray Kelly's arrest for distribution and possession
with intent to distribute cocaine, but prior to his being
incarcerated, that Ray and/or Casee Kelly purchased numerous
money orders. Multiple money orders were purchased on the same
day at various post offices. Based on information received from
the United States Postal Service your affiant knows that Ray

47

and/or Casee Kelly have cashed at least $108,000 worth of money orders thus far. Based on records obtained to date the last money orders cashed were on July 24, 2006, which is after Ray Kelly became incarcerated at FCI La Tuna. Your affiant further has reason to believe, based on telephone calls recorded at FCI La Tuna between Ray and Casee Kelly, that Casee Kelly is still in possession of money orders that were purchased during the time period prior to Ray Kelly's going to prison, and that she is in the process of converting some of them to cashier's checks. These same telephone calls indicate that Casee Kelly is managing the financial affairs for herself and Ray Kelly while Ray Kelly is in jail and that in addition to instructions given by telephone Ray Kelly also writes letters to Casee Kelly instructing her on financial matters.

52.  In a call that took place on October 9, 2006, Ray Kelly asked Casee Kelly if they still had money and Casee Kelly replied that they did, but that she was acting like they did not have any.

53.  On October 12, 2006, Ray Kelly asked Casee Kelly if she had taken care of the things with the Credit Unions in San Francisco that he had asked her to take care of. Casee Kelly told Ray Kelly that she had tried to do what he asked, but they would not accept those things and that they expired in 90 days. Casee Kelly told Ray Kelly that she went to the Post Office and

they told her that they, referring to postal money orders, never expired. Ray Kelly told her to go to a bank and cash them and then she could deposit the money. Later on in the conversation, Ray Kelly told Casee Kelly to turn the postal money orders into cashier checks and then she could deposit the cashier checks into the accounts he wanted her to deposit them into. Your affiant believes that Ray and Casee Kelly are discussing the money orders they purchased before Ray Kelly went to prison. On October 14, 2006, Ray Kelly told Casee Kelly that she was to give the postal money orders to "pops," who is believed to be Ray Kelly's father, to deposit in the accounts he wants the money deposited into. Ray Kelly also asked Casee Kelly if she ever got his letters in which he gave her instructions about investing money.

54. On February 14, 2007, Ray Kelly told Casee Kelly that the situation she is in, she is not "broke." Ray Kelly also refers in this case to a "nest egg," that Casee Kelly has, which the average person does not.

SANDRA J. MAIER
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this _____ day of May 2007

U.S. Magistrate Judge

49

they told her that they, referring to postal money orders, never expired. Ray Kelly told her to go to a bank and cash them and then she could deposit the money. Later on in the conversation, Ray Kelly told Casee Kelly to turn the postal money orders into cashier checks and then she could deposit the cashier checks into the accounts he wanted her to deposit them into. Your affiant believes that Ray and Casee Kelly are discussing the money orders they purchased before Ray Kelly went to prison. On October 14, 2006, Ray Kelly told Casee Kelly that she was to give the postal money orders to "pops," who is believed to be Ray Kelly's father, to deposit in the accounts he wants the money deposited into. Ray Kelly also asked Casee Kelly if she ever got his letters in which he gave her instructions about investing money.

54. On February 14, 2007, Ray Kelly told Casee Kelly that the situation she is in, she is not "broke." Ray Kelly also refers in this case to a "nest egg," that Casee Kelly has, which the average person does not.

SANDRA J. MAIER
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this ___/0^th___ day of May 2007

U.S. Magistrate Judge

49